ROBERT B. WATHEN et al. *v.* JANE A. PEARCE.
[No. 72, October Term, 1938.]

654

*Decided January 11th 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*John H. Skeen,* with whom were *Emory, Beeuwkes, Skeen & Oppenheimer* on the brief, for the appellant.

*William A. Grimes,* with whom were *Ritchie, Janney, Ober & Williams* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Robert B. Wathen and Lottie V. Wathen, the appellants, as partners, and Jane A. Pearce, the appellee, severally own fractional undivided interests in six barges which are employed in the transportation of freight, bay and coastwise, and are operated by the appellants as managing owners.

Jane A. Pearce, the widow of Alvin A. Pearce, now owns the following fractional shares of the several barges: 1/32 of each of three barges, 3/32 of one barge, 1/16 of one barge, and 5/64 of one barge, which her husband owned at his death, and she therefore holds a minority interest in each barge. The majority interest in each barge is owned or controlled by the appellants, who operate them all as managing owners.

The barges are vessels used for the transportation of water borne freight, are without motive power, and are towed from place to place. In their operation expenses are incurred for towing, the wages of employes, repairs, insurance, commissions, food, and other similar needs, which are paid when possible from the earnings of the barges. It is not apparent that, apart from fluctuating

accumulations of such earnings, the owners maintain any operating balances or capital reserve for operating the barges, but the managing owners have been accustomed for some time to impound and retain a portion of the earnings of the barges, of not less than $200 on each barge, or not less than $1,000 for the six barges, as working capital. When Alvin A. Pearce acquired the interests which the appellee now holds it is said that he knew of that custom and assented to it, but it does not appear that at his death, his widow, the appellee, was apprised of the fact that he had acquiesced in it, or that she herself knew of it.

On September 24th, 1937, the books of the appellants showed a credit balance resulting from the operation of the six barges of $829.46 in favor of the appellee. On the theory that those entries constituted a promise by the appellants to pay that sum, the appellee brought this action of account stated, to secure a judgment therefor against the appellants.

The defendants pleaded the general issue and a special plea setting up the defense that, to earn freight charges, expenses incident to the operation of the barges are necessarily incurred and are payable before earnings are available to defray them, that defendants are under no obligation to pay appellee's proportion of such charges out of their personal funds, that appellee has neglected to provide a fund for the payment of such expenses, and that by the custom of the trade appellants are entitled to retain a reasonable amount of plaintiff's share of the earnings of the barges for necessary operating expenses, and that the amount now retained by the defendants is less than the amount which they may reasonably retain from plaintiff's share of such earnings for that purpose. The plaintiff, instead of traversing or otherwise replying to that plea, joined "issue" thereon. But as the case was tried as though it were properly at issue on that defense, the irregularity will be disregarded.

The trial of the case resulted in a verdict for the plaintiff for the full amount of the retained balance, and from

that judgment this appeal was taken. It submits four exceptions, three relating to questions of evidence, one, the fourth, to the court's rulings on the prayers.

There was evidence in the case tending to prove these facts: The accounting practice of the defendants with respect to the barges was thus described by Lloyd H. Lewis, who keeps their books and who was the only witness called by the plaintiff: "I enter into the voyage account of each barge the amount of freight and any other revenue we may get, and charge against it any towing or other bills in the nature of commissions or insurance, and strike a balance at the end of each voyage, and then ascertain what each interest in the barge is entitled to or to be charged with. The commission items which appear in a number of voyage accounts represent a commission charged to the boat for broker cargo, and this is not in all cases payable to Wathen and Company. Some other brokers may charter the barge and procure the cargo. Without giving the details of each and every voyage of all these barges from December 1st, 1934, to September 27th, 1937, the statement of account with Mrs. Pearce as of September 27th, 1937, shows that there has been credited to her from the trip statements of the various barges $829.46. That is made up of the trips of all of these six barges for the period from December 1st, 1934, which was the date of the last settlement with her and approximately as of Captain Pearce's death. Some of the trip statements might show as many as four or five voyages. We don't make a statement up for each voyage. For instance, if we go to New York with a cargo of coal and bring back a cargo of fertilizer or something else, we would put them in as one trip, but there are a great many voyage statements covering two or three trips in each statement. Some of them show a profit and others show a loss. The records show that the gross profit or total amounts credited to her up until September 27th, 1937, were $1,091.92, the total of the various amounts credited after various voyages, and as against that we have certain debits totalling $261.86, and that represented

losses on some six voyage statements, whereas there were profits on some, roughly, twenty-five."

The appellants have been engaged in the business of boat owners and operators for thirty-five years and at present operate thirty-five barges, including the six under consideration here. Robert B. Wathen, an appellant, testified that the partners are managing owners of the six barges and have been since they owned interests in them, a period of fifteen or twenty years; that where they own a majority interest they become managing owners "automatically", where they own less than that, they are managing owners by appointment of the majority. In the course of his examination Wathen said that it had been "our custom" to retain a portion of each boat's earnings for working capital, and that usually they "have it understood with the owners * * * when they go in, how much to retain as we did in this instance. * * * I am just giving the custom".

The amount of the contribution exacted from each co-owner is in the discretion of Wathen, and is affected by two factors, one, the extent of the owner's share, the other, the probable cost of operating the boat and keeping it in repair. The amount varies in proportion to the amount required to keep the several barges in seaworthy and usable condition.

"Every year the boats at regular intervals are tied up for the U. S. Steamboat Government Inspection. They come and look the boat over, and say just what should be done, in their opinion, before they will give us a renewal of our certificate to operate her for the next year. Aside from the government, the cargo underwriter, insurance, will come and look over the boat and will say what should be done to keep the boat up in a seaworthy condition, so that she would be insurable to handle cargo operating coastwise. Then we have the American Bureau of Shipping, who now inspects the barge every year—goes all over her and makes certain recommendations that we have to do, in order to get a loadline, in order that the boat can operate and carry cargo. We have no control

over these inspections. Every boat owner and operator on the Atlantic seaboard has to do the same."

At the time of the trial, five of the barges were tied up for inspection, and it will be necessary to spend from two to five thousand dollars on each of them, and when those repairs are completed the $829.46 credited to Mrs. Pearce will not be sufficient to meet her share of that expense. Bills against the owners are paid monthly, and bills for freight are sent monthly, but in some cases they extend credit of thirty, sixty or ninety days to their customers.

Although the case was tried before a jury, the exceptions to the evidence are so involved with colloquies between court and counsel that it is difficult to discover either their purpose or the particular ruling to which they are directed, except the first exception, which is quite without merit. Wathen was asked whether he had "had any trouble with any of the other owners, except Mrs. Pearce, at this time". The court sustained an objection to the question, and that ruling is the subject of the first exception. The issue in the case was not whether Wathen had had trouble with other owners but whether he owed money to Mrs. Pearce. Whether the other owners were too good natured or she too exacting was wholly collateral, and there was no error in that ruling.

The second exception follows a colloquy between counsel for the defendants and the court, covering more than two printed pages of the record, but no ruling is found or statement made to which the appellants excepted. That exception must therefore be disregarded. The third exception apparently embraces all rulings made throughout the trial of the case both on the prayers and on questions of evidence, and cannot for that reason be considered in this court. *Guth v. Elliott*, 158 Md. 243, 250, 148 A. 216, and cases there cited.

The fourth exception is to the court's rulings on the prayers. The two principal points relied upon by the appellants in support of the appeal, are (1) that one joint owner of personal property cannot sue another joint

owner thereof at law for a share of the joint profits, and (2) that conceding for the argument that, under the statute of 4 Anne, ch. 16, sec. 27, and the Statute of 52 H. 3, Cap. 23, one joint tenant may sue another at law as on an account stated, that this action is not on an account stated. There are three demurrer prayers, but no variance prayer, so that in dealing with the demurrer prayer, the inquiry is whether the evidence makes out a cause of action regardless of the pleadings.

In *Hamilton v. Conine,* 28 Md. 635, 642, the court, in dealing with litigation concerning disputes between joint tenants, co-parceners, partners, and others in similar relations, laid down what is still the law of this state in this language: "By the Statute of 4th Anne, ch. 16, sec. 27, it was provided, that 'actions of account shall and may be brought and maintained by one joint tenant and tenant in common against the other as bailiff, for receiving more than comes to his just share or proportion.' This form of action, thus given by statute, as well as the common law action of account, is, in practice, but seldom used, a bill in equity being in most cases the more convenient and effectual remedy; but the action of account may still be resorted to in this State, in cases to which it is applicable. *Gibbs v. Clagett,* 2 G. & J. 17; *Green v. Johnson,* 3 G. & J. 394. Here, as in England, common law and equity jurisdictions are carefully separated, and we have closely followed the English practice; we see no good reason why it should be departed from in this instance. In *Browne on Actions at Law,* 132 (45 Law Lib., 99) the rule is thus stated: 'Joint tenants, tenants in common and co-parceners cannot in general, maintain any action against each other because they are in the nature of partners;' and in 1 *Chitty's Pl.,* 39, it is said: 'At law one partner or tenant in common cannot, in general, sue his co-partner or co-tenant, in any action, in form ex-contractu, but must proceed by action of account or by bill in equity.' In reference to the right to sue each other and the mode of doing so, tenants in common are thus assimilated to partners; the rules of law governing ac-

tions between the latter, apply with equal force to the former, and this analogy runs through all the decisions." The authority of that case was recognized as late as *Redue v. Hofferbert,* 161 Md. 296, 303, 157 A. 294, and the principles stated are supported by the general weight of authority. 27 *A. L. R.* 240, 21 *A. L. R.* 34. And in *Milburn v. Guyther,* 8 Gill 92, 94, while holding that joint owners of a vessel are not necessarily partners, it is nevertheless said: "But it by no means thence follows, that upon the termination of the joint ownership, by their authorised act, or during its continuance, they can maintain actions at law against each other, either for the recovery of the vessel or their respective proportions of the freight received by the part owners in the employment of the vessel; or that if one of the part owners, by the consent of all, and for the benefit of all the owners, sells the vessel and receives the proceeds of sale, as in the case before us, that each of the other part owners can separately maintain an action at law for the proportion of the proceeds of sale which he was entitled to claim of the part owner by whom the sale was made."

So that the controlling question in the case is whether the evidence is legally sufficient to show that the defendants are indebted to the plaintiff on an account stated.

In law the term "account stated" is an artificial phrase of precise and definite significance. In 1 *C. J. S. Account Stated,* sec. 1, page 693, it is thus defined: "An account stated is an agreement between parties who have had previous transactions of a monetary character that all the items of the account representing such transactions, and the balance struck, are correct, together with a promise, express or implied, for the payment of such balance." *Bullen & Leake, Prec. & Pl.* 52, n. (a) ; *Alexander's Brit. Stat. (Coe's Ed.)* 65. An indispensable ingredient of any definition of the term is a definite acknowledgment of a subsisting debt immediately payable to the plaintiff, 1 *C. J. S., Account Stated,* secs. 1, 14, pages 694, 698. It is more than a mere balancing of entries in books of account, although such balances may be evidence of an

account stated, and it is the antithesis of an open or running account. 1 *C. J. S., Account Stated,* sec. 1, page 695. It not only implies striking a balance, but an assent on the part of the person sought to be charged that the balance struck· is the true measure of his indebtedness to the plaintiff. 1 *Poe, Pl. & Pr.,* secs. 127, 128, 129.

In this case the account sued on was in the course of the trial shown the witness Lewis and he was examined as to it. So that while not formally offered, it was nevertheless in evidence, *Dean v. Eastern Shore Trust Co.,* 159 Md. 213, 220, 150 A. 797; 64 *C. J.* 115. That account credited the appellee with amounts aggregating $1,091.32, and charged her with other amounts aggregating $261.86, and after subtracting the debits from the credits concluded with these words, following an entry of September 24th, 1937: "Balance due $829.46", and it began with the words "Statement Account of Barge Interests of Jane A. Pearce to September 27, 1937," "1936 April 28 * * * Statement rendered $383.82". Under any definition of the term that paper was at least *prima facie* evidence of an account stated, *Brown v. Southern Grocery Co.,* 168 Ark. 547, 271 S. W. 342; 1 *C. J. S. Account Stated,* sec. 1, page 694, since it was on its face an unqualified acknowledgment that defendants were indebted to the plaintiff for the balance stated to be due.

As pointed out in *Milburn v. Guyther, supra,* while joint owners of a ship are not by virtue of that relationship alone partners, nevertheless the relation between them is analogous to that of a partnership. A partner who refuses to contribute funds essential to the operation of a partnership business may properly be excluded from participation in its profits. 47 *C. J.* 789; *Rowley on Partnership,* par. 343. Nevertheless an incident of a partnership is the division of profits at reasonable intervals, 47 *C. J.* 788. Ordinarily the rights of partners to participate in partnership profits should be litigated in a court of chancery, and so by analogy the general rule seems to be that the rights of a co-owner of a ship who seeks an adjustment of accounts between himself and his

co-owners must be litigated in the same forum (*L. R. A.* 1917A, 1112, *Milburn v. Guyther, supra*), but the rule announced in *Milburn v. Guyther* is not inconsistent with the position taken in *Hamilton v. Conine, supra,* that in a proper case an action on an account stated may be brought by one co-partner against another, for the court in *Milburn v. Guyther, supra,* said: "It cannot be pretended that, upon the testimony offered, there was any such settlement of accounts, or balance struck between the part owners, or between the plaintiff and defendant in this appeal, as would warrant the jury in finding such an express or implied promise as would entitle the former to the set off he has claimed from the latter, as a separate debt between them." It has been held that as between themselves partners may make statements of account which will be binding on them (1 *C. J. S., Account Stated,* sec. 12, page 698), but assent to such statements will not be implied where they were merely intended to show the condition of the firm (*Ibid.*), or its profits. *Broderick v. Beaupre,* 40 Minn. 379, 42 N. W. 83.

Reverting now to the prayers, appellants contend that the plaintiff's prayer instructed the jury to return a verdict for the plaintiff. But it had no such effect. What it did was to instruct the jury that there was no legally sufficient evidence of any prevailing custom affecting the rights of the parties or of any agreement with the plaintiff; it still left the jury to find the relation between the parties, whether there had been an account stated, and whether appellants had paid the balance. There was no legally sufficient evidence of such a custom as would bind the plaintiff, nor was there any evidence of an agreement between her and the appellants. Before a usage or custom can be admitted to affect a contract, it must be shown by clear and convincing evidence to be definite, uniform, well established, and so general that knowledge of it may be presumed, or that it was known to the parties whose rights may be adversely affected by it (17 *C. J.* 458, 27 *R. C. L.* 152, 197), although knowledge of a trade usage will be imputed to persons in the

same trade. 17 *C. J.* 461, 449, *et seq.; Blake v. Stump,* 73 Md. 160, 20 A. 788; *Barker v. Borzone,* 48 Md. 474; *Duling v. Philadelphia, W. & B. R. Co.,* 66 Md. 120, 6 A. 592; *Foley & Woodside v. Mason & Son,* 6 Md. 37; *In re Trust Estate of Murray and Hazelhurst,* 24 Md. 520; *Chesapeake Bank v. Swain,* 29 Md. 483; *Gibney v. Curtis,* 61 Md. 192; *Citizens' Bank v. Grafflin,* 31 Md. 507, 66. Proof of the customs, habits or conduct of an individual is not admissible to show a general usage (*Penn Oil Co. v. Triangle P. & G. Co.,* 136 Md. 559, 581, 111 A. 482), and where evidence is offered to show the usage in a particular trade, it must be as to a usage general in that trade. *Oelrichs v. Ford,* 21 Md. 489, 520.

It is conceded that the plaintiff herself was not apprised of the alleged usage, and while it is undisputed that her husband had knowledge of it, it does not appear whether she acquired his shares as a distributee of his estate, as donee, or as a purchaser for value, and appellants do not contend that his knowledge should be imputed to her. Nor is there any evidence in the case that any such usage prevails generally in the trade in which the parties are engaged as that suggested by appellants. Not a single question was asked of any witness as to the existence of such a usage, nor is there a single statement which can be interpreted as evidence of its existence. Wathen, indeed, did refer to "our custom", meaning the custom of the managing owners, but he said nothing of any custom of the trade, and nowhere else in the record is there mention either of custom or of usage.

The prayer itself stated what was undeniably true, and since it did not go to recovery but merely narrowed the issues by excluding from the consideration of the jury matters which they could not properly consider, it was properly granted.

The defendants offered three prayers, which in one form or another amounted to demurrers to the evidence, and were refused. As stated above, there was no variance prayer, nor was there any demurrer to the declaration, nor any demand for the particulars thereof, so

that the case went to the jury on the evidence alone. If that made a case on any theory, the plaintiff was entitled to recover. It did appear on a statement prepared by the defendant that the plaintiff was entitled to a net credit on its books of $829.46, composed of credits which had been accumulating over a period of years. That may be interpreted as an acknowledgment that they owed the plaintiff that amount, and their promise to pay the same may be implied from that acknowledgment, 1 *C. J. S. Account Stated,* secs. 31, 34, pages 711, 713. In the absence of any agreement to the contrary, or contrary usage, while they were entitled to demand of the plaintiff contribution to the expense necessary for the future operation of the business in proportion to her interest therein, they were not entitled to withhold from her net profits which had definitely been allocated to her, accruing from its past operations. There was therefore no error in those rulings. For the same reason the appellants' second prayer, which would have instructed the jury that they "are entitled to retain from the Plaintiff's share of the gross earnings, if any, of the said barges such amount, or amounts, as the Jury may find are reasonably necessary to pay the said current operating expenses", was properly refused.

Nor was there error in refusing appellants' first prayer, that "the Defendants, as managing owners, are under no legal obligations to advance from their own funds the plaintiff's proportion of the current operation expenses of the barges in which she owns minority interest". While there was some evidence in the case tending to show that the amounts credited to the plaintiff on appellants' books were not profits, but a temporary surplus over current needs, and that the condition of the common property was such that needed repairs would absorb that surplus, the prayer did not deal with that evidence. As it reads, "current operating expenses" may mean operating expenses for past, future, or present operations. But there was no evidence that plaintiff had not been charged her full share of all operating expenses

on past operations, and such charges deducted from her share of the gross profits before she was credited with a net balance of $829.46. The word "current" could not have been meant to refer to present operations, for it was admitted by the defendants that five of the six barges were tied up and out of commission. It must therefore have been intended to apply to expenses incurred coincidentally with future operations. But the issue in the case was whether the defendants were indebted to the plaintiff for profits resulting from past completed operations wrongfully withheld from her. There was no contention that defendants as managing owners were under any legal obligation to advance from their own funds the plaintiff's proportion of the operating expenses of the barges, nor was there any evidence that the defendants had ever demanded that plaintiff contribute to the cost of anticipated repairs. An inference, possible but tenuous, could have been drawn, that as the value of the vessels depreciated with use and time, defendants could have set up the balance as a depreciation reserve. But they did not do that, nor did the prayer present that theory. Whether the plaintiff is obliged in law to contribute to the expense of preserving or repairing the common property can be dealt with only after she has refused after demand to make such a contribution. But on the evidence that question is not in this case. *L. R. A.*, 1917A, 1112. The prayer was therefore misleading, presented a theory collateral to the issues, and was ambiguous, and was properly refused.

Finding no error in the rulings presented by the appeal, the judgment will be affirmed.

*Judgment affirmed, with costs.*